Cyndie M. Chang (SBN 227542)
cmchang@duanemorris.com
**DUANE MORRIS LLP**
865 South Figueroa Street, Suite 3100
Los Angeles, CA 90017-5450
Tel.: 213-689-7432
Facsimile: 213-689-7401

Jennifer Lantz (SBN 202252)
jmlantz@duanemorris.com
**DUANE MORRIS LLP**
2475 Hanover St.
Palo Alto, CA 94304
Tel.: 650-847-4150
Facsimile: 650-847-4151

Meghan C. Killian (SBN 310195)
mckillian@duanemorris.com
**DUANE MORRIS LLP**
One Market Plaza
Spear Tower, Suite 2200
San Francisco, CA 94105
Tel.: 415-957-3138
Facsimile: 415-840-0017

Attorneys for Plaintiff
Coastal Cocktails, Inc.

**Per L.R. 7-19:** Defendant's counsel is believed to be Jaqueline M. Lesser, Baker Hostetler LLP, 12th Floor, 2929 Arch St., Philadelphia, PA 19104. Ms. Lesser's office phone number is 215-564-2155 and her email is jlesser@bakerlaw.com.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COASTAL COCKTAILS, INC. d/b/a MODERN GOURMET FOODS, a California corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>FRANKFORD CANDY, LLC, a Delaware limited liability company,<br><br>    Defendant. | Case No. 8:21-cv-01548-DOC-KES<br><br>**PLAINTIFF COASTAL COCKTAILS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Date: TBD<br>Dept.: Courtroom 9 D<br>Judge: Hon. David O. Carter |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................. 1

II.   STATEMENT OF FACTS..................................................................... 3

    A.    Hot Chocolate Bombs and their Recent Popularity.......................... 3

    B.    Coastal Cocktails and Its Sale of Hot Chocolate Bombs ................. 6

    C.    The USPTO Recognizes that "Bomb" and "Hot Chocolate Bomb" are Generic Or Descriptive ........................................................... 7

    D.    Frankford's BOMB Application and Enforcement.......................... 9

    E.    Consumer Searches on Amazon ................................................. 10

III.  ARGUMENT ....................................................................................11

    A.    Legal Standard........................................................................ 11

    B.    Coastal is Entitled to a Temporary Restraining Order................... 12

        1.    Coastal is Likely to Succeed on the Merits of its Invalidity Claim ............................................................. 13

            a.    Defendant's BOMB Term is Generic and Unenforceable .........................................................13

            b.    Third Party Uses Show Genericness of Defendant's Claimed Mark...........................................................14

            c.    Trademark Office Recognizes Genericness of Defendant's Claimed Mark.......................................17

        2.    Coastal Has Shown That It Will Suffer Irreparable Harm ..... 19

        3.    The Balance of Hardships Favors Coastal and Issuing an Injunction........................................................................ 22

        4.    The Public Interest Favors Preliminary Relief .................... 24

    C.    No Bond Should be Required..................................................... 24

IV.   GOOD CAUSE EXISTS FOR WAIVING EX PARTE NOTICE .............25

V.     CONCLUSION ......................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alliance For The Wild Rockies v. Pena,*
   865 F.3d 1211 (9th Cir. 2017) ................................................................... 11-12

*Amaraetto Ranch Breedables, LLC v. Ozimals, Inc.,*
   790 F. Supp. 2d 1024 (N.D. Cal. 2011)............................................................ 12

*Beyond Blond Prods., LLC v. Heldman,*
   479 F. Supp. 3d 874 (C.D. Cal. 2020)...................................................... *Passim*

*Carter-Wallace, Inc. v. Procter & Gamble Co.,*
   434 F2d 794 (9th Cir. 1970)............................................................................ 19

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.,*
   468 F. Supp. 2d 1181 (C.D. Cal. 2007)................................................... 13, 15-16

*Closed Loop Marketing, Inc. v. Closed Loop Marketing, LLC,*
   589 F. Supp. 2d 1211 (E.D. Cal. 2008) ........................................................... 16

*Design Furnishing, Inc. v. Zen Path, LLC,*
   No. 10-2765, 2010 U.S. Dist. LEXIS 135819 (E.D. Cal. Dec. 23, 2019) ............. 12

*Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.,*
   198 F.3d 1143 (9th Cir. 1999) ........................................................ 13-14, 18-19

*Guzman v. Shewry,*
   552 F.3d 941 (9th Cir. 2009)........................................................................... 12

*Immigrant Assistant Project of Los Angeles County Fed'n of Labor v. INS,*
   306 F.3d 842 (9th Cir. 2002).......................................................................... 12

*Jorgensen v. Cassiday,*
   320 F.3d 906 (9th Cir. 2003)........................................................................... 23

*Krav Maga Ass'n of Am., Inc. v. Yanilov,*
   464 F. Supp. 2d 981 (C.D. Cal. 2006)..................................................... 13-14, 17

*Rotoworks Int'l Ltd. v. Grassworks USA, LLC,*
   2007 WL 2582202 (W.D. Ark. Sept. 4, 2007)................................................... 21

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,*
   240 F.3d 832 (9th Cir. 2001)..............................................................16, 20, 22

*Surgicenters of Am., Inc. v. Medical Dental Surgeries, Co.,*
   601 F.2d 1011 (9th Cir. 1979) ................................................. *Passim*

*Threshold Enters. Ltd. v. Pressed Juicery, Inc.,*
   445 F. Supp. 3d 139 (N.D. Cal. 2020)................................................. 14-15, 17

*Tranik Enterprises, Inc. v. Fulda,*
   No. 2:16-CV-02931-SVW-JC, 2017 WL 11150925 (C.D. Cal. Mar. 7, 2017) ................................................................................................... 19

*United States v. Tribune Publishing Co.,*
   2016 WL 2989488 (C.D. Cal. Mar. 18, 2016)................................................. 23

**Other Authorities**

Fed. R. Civ. P. 65 (b)........................................................................... 24

Fed. R. Civ. P. 65(b)(1)....................................................................... 11

Fed. R. Civ. P. 65(c) .......................................................................... 23

## I.    INTRODUCTION

Plaintiff, Coastal Cocktails, Inc. d/b/a/ Modern Gourmet Foods ("Coastal") and Defendant Frankford Candy both sell hot chocolate bombs.  A hot chocolate bomb (sometimes called a hot cocoa bomb or a cocoa bomb) is a hollow ball of chocolate filled with hot chocolate mix along with marshmallows or other hot chocolate add-ins. When dissolved in hot milk or water, the hot chocolate bomb "explodes," releasing its contents and (with a bit of stirring) creating a cup of hot chocolate.  The product has become a viral sensation, as millions of people share and watch videos showing use of hot chocolate bombs to make hot chocolate, "unboxing" hot chocolate bombs, and teaching others how to make homemade hot chocolate bombs.

This dispute arises because Defendant is using Amazon's intellectual property complaint process as a *de facto* injunction to keep Coastal from continuing to sell its products on Amazon, despite having competed there with Defendant for over a year without any confusion.  Defendant claims to have exclusive rights in the term "bomb." Amazon refuses to restore Coastal's product listings unless Defendant withdraws its complaints.  Even though Coastal has provided Defendant with extensive evidence of the genericness of "hot chocolate bombs" and "bombs" for the relevant product, Defendant has not withdrawn the complaints, and Coastal is forced to seek the Court's intervention ordering Defendant to withdraw the complaints and not submit new ones until this dispute is resolved.  Because Coastal can show that all the factors clearly favor its position, the Court should issue a preliminary injunction ordering withdrawal of the complaints and ordering that Defendant refrain from submitting new complaints to Amazon on the same grounds until the issue of the genericness of "bomb" is resolved.

A Google search for "hot chocolate bombs" returns more than 700,000 results for articles, recipes, how-tos, and other content about hot chocolate bombs. The same search on Google's shopping site returns hundreds of hot chocolate bombs from both established companies and independent sellers.   And a search of the hashtag #hotchocolatebombs on the popular video sharing platform TikTok returns videos that

have been viewed more than 300 million times.

As the name of a category of product—a "genus" in trademark lingo—no one can own exclusive rights in the term "hot chocolate bomb."  That's because hot chocolate bombs are not a brand, but are the product itself, as evidenced by the countless seller, media and consumer references to hot chocolate bombs as a product, not as a brand.  The same applies to the noun portion of "hot chocolate bomb" standing alone.  A "bomb" is simply a generic or descriptive term for a product that melts or dissolves in some liquid.  Consumers purchase bath bombs, cocktail bombs, tea bombs, and smoothie bombs, to name a few, from a wide variety of sources.

None of this should be controversial, and yet Defendant has recently embarked on a campaign to squelch legitimate competition from other hot chocolate bomb sellers—and specifically from Coastal—by disingenuously claiming to have the exclusive right to use the terms "bomb" and "hot chocolate bomb" in the sale of hot chocolate bombs.  Defendant improperly obtained a registration from the Trademark Office for BOMB, and has used that to file trademark complaints with Amazon.com against Coastal's BOMBOMBS hot chocolate bomb listings.   Amazon is one of the main avenues through which Coastal sells its products, and Defendant's complaints resulted in Amazon removing *all* of Coastal's hot chocolate bomb listings, at a cost to Coastal of untold numbers of sales and damage to its reputation and competitive standing.   The harm is especially acute because Defendant's actions come shortly before the seasonal demand for hot chocolate bombs kicks into high gear.

Amazon's process for complaints from trademark owners requires only a US registration – no other proof of likelihood of confusion or validity, and Amazon's opaque process is the judge, jury and executioner.   Amazon need not provide any reasoning or insight into why listings are taken down, other than the bare fact that a trademark owner made a complaint.  Unlike a court process, the burden is then on the accused party to convince Amazon to put the listing back up, and there is no appeal from a refusal to do so.  Defendant's abuse of Amazon's complaint procedure provides

an end-run around the judicial process to receive an indefinite extrajudicial injunction without having to show a likelihood of success on the merits, irreparable harm, balancing of the equities, or the public interest, or to post a bond securing against Coastal's lost sales (which continue to increase daily) from the removal of its listings.

Coastal immediately demanded that Defendant withdraw its improper complaints and ask Amazon to restore Defendant's product listings—and Coastal asked Amazon to do so itself, without success.  As a result, Coastal is suffering irreparable harm, including loss of customers, loss of goodwill, damage to its reputation, downgrading in the Amazon algorithm for each day the product is off the Amazon platform, and possible termination from the Amazon platform if further complaints are made by Defendant.  All during a crucial time for Coastal's business.  Accordingly, Coastal seeks preliminary relief that would restore the pre-takedown status quo—and the lawful competition between Coastal and Defendant—while Coastal seeks a final judgment that Defendant's alleged BOMB mark is invalid, that Defendant has no rights to prevent others from using the terms "bomb" and "hot chocolate bomb," and that Defendant's actions amount to unfair competition.  Coastal has also filed a cancellation action in the US Patent and Trademark Office seeking to cancel Defendant's registration on the same grounds.

## II.    STATEMENT OF FACTS

### A.    Hot Chocolate Bombs and their Recent Popularity

Hot chocolate bombs became a "viral" product toward the end of 2020.  Declaration of Boaz Shonfeld ("Shonfeld Decl.") at ¶ 4.  A hot chocolate bomb is a hollow ball of chocolate filled with hot chocolate mix along with marshmallows or other hot chocolate add-ins.  *Id*.  When dissolved in hot milk or water, the hot chocolate bomb "explodes," releasing its contents and (with a bit of stirring) creating a cup of hot chocolate.  *Id*.  An example of a generic hot chocolate bomb used to illustrate a recipe for hot chocolate bombs on the Sugar Geek Show blog is below:



*See*  https://sugargeekshow.com/recipe/shiny-chocolate-bombs-with-marshmallows/;
Declaration of Jennifer Lantz ("Lantz Decl.") ¶ 15 & Ex. F.  Numerous sellers offer
hot chocolate bombs, and refer to them as such.  Shonfeld Decl. ¶¶ 14-16.

Perhaps owing to the pandemic, hot chocolate bombs have been popular on
social media, with people sharing videos and photos of themselves using and making
hot chocolate bombs.  *Id.* ¶¶ 7-8.  One way to track the posts is through the use of
"hashtags," which allow users to search for content about a particular topic, and to tag
their own content so that it shows up in others' search results.  Hot chocolate bombs
are popular on Instagram, where there are more than 230,000 posts using the
#hotchocolatebomb hashtag.  Shonfeld Decl. ¶ 8 & Ex. C.  These posts overwhelmingly
refer to hot chocolate bombs as the product itself, and not to a brand.  *Id.*  Searches on
Twitter likewise show numerous users referencing hot chocolate bombs as a product
category.  *Id.* ¶ 8 & Ex. B.

On the video sharing platform TikTok, videos with the hashtag
#hotchocolatebombs have been viewed more than 300 million times.  *Id.* ¶ 7.  These
videos use "hot chocolate bomb" to refer to a product category—chocolate balls that
dissolve in liquid to make hot chocolate—and not to any particular seller or brand.  One
video from November 2020 showing a user making hot chocolate bombs has been
viewed more than 14 million times, and has the caption "My first attempt at hot

chocolate bombs". *Id.* at ¶ 7 & Ex. A:



This social media use of hot chocolate bombs as a generic term fits in with the countless online and print media and blog references to hot chocolate bombs as a product category. The New York Times has written that the "hot chocolate bomb is a tasty metaphor for a pent-up year" and provided readers with a recipe for how to make hot chocolate bombs on their own. Lantz Decl. ¶ 14(e) & Ex. M. Numerous other online food publications have posted articles detailing the "viral trend," all of which discuss "hot chocolate bombs" as a generic product. *Id.* ¶ 14 & Ex. M. For example, the website "Eater" posted an article stating that "hot chocolate bombs . . . are a truly over-the-top way to level up your cocoa game," and highlighting the variety of sellers offering "hot cocoa bombs":

> Hot cocoa bombs are seriously trendy right now, written up in the New York Times, popping up in cafes, fancy chocolate shops, and even luxury retailers — Neiman Marcus is currently hawking a $32 hot chocolate bomb that's painted pink and shaped like a snowman, made by Dallas chocolatier Kate Weiser. At the Ganachery in Florida's Disney Springs, there's a virally popular bomb shaped like Olaf from the movie Frozen. They're also all over Etsy, including vegan options, extra-large bombs topped with whole Oreos, and white chocolate bombs decorated to look like unicorns.

*Id.* ¶ 14(d) & Ex. M. And multiple online recipes offer do-it-yourself hot chocolate bombs, from the "best, easiest way to make hot chocolate bombs at home" to established companies like Ghirardelli providing instructions on how to make hot

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

chocolate bombs using Ghirardelli chocolate. *Id.* ¶ 15 & Ex. N.  All of these recipes—including branded ones like the Ghirardelli recipe—use "hot chocolate bombs" in the generic sense.

## B.    Coastal Cocktails and Its Sale of Hot Chocolate Bombs

Coastal is a leading seller of innovative and creative food gifts for different gift giving seasons.  Shonfeld Decl. ¶ 2.  Coastal's business includes making and selling products in collaboration with well-known brands, as well as selling products under its own brands.  *Id.*  Coastal's success depends in part on identifying potentially viral products, which generate excitement and inspire people to share their experience with the product through social media.  *Id.* ¶ 3.  Coastal's goal is to be among the early sellers of the product, in order to capture sales as the product increases in popularity, and before too many other sellers enter the market or the trend fizzles out.  *Id.*

Coastal has been developing and promoting hot chocolate bombs since 2019, and has referred to its product as such that entire time.  *Id.* ¶ 5.  Since that time, countless other sellers have likewise sold hot chocolate bombs <u>as</u> hot chocolate bombs. *Id.*  As explained above, the popularity of hot chocolate bombs "exploded" at the end of 2020 based on social media posts and videos showing hot chocolate bombs dissolving, rating and "unboxing" different hot chocolate bombs, and providing tips to people who want to make their own hot chocolate bombs.  *Id.* ¶ 7.  Coastal's product, which it started branding as BOMBOMBS in October 2020, has been highlighted as at the center of this wave of popularity.  *Id.* ¶ 6.  A February 2021 article in Modern Retail, an online magazine, featured Coastal's BOMBOMBS product and highlighted Coastal's efforts to capitalize on the "virality potential" of the product in its marketing. *Id.* ¶¶ 12-13 & Ex. D.  Coastal sells its BOMBOMBS hot chocolate bombs through online platforms such as Amazon.com.  *Id.* ¶ 9.  Coastal's product packaging is an attractive arrangement of individually foil-wrapped hot chocolate bombs of different flavors, featuring the BOMBOMBS trademark prominently, with "hot chocolate bombs" in smaller lettering underneath.  *Id.* ¶ 10.



The ability to sell products across multiple platforms, and particularly on Amazon.com, is crucial to Coastal's business and success. *Id.* ¶ 11.  Amazon is one of the largest retailers in the world, if not the largest.  *Id.*  Products like hot chocolate bombs are purchases that depend on a consumer's ability—sometimes driven by an online article or viral video—to quickly and efficiently search for the product, often with free and fast shipping.  *Id.*  Viral products can have a short-lived popularity, and companies like Coastal depend on platforms like Amazon to quickly go to market.  *Id.* Without the ability to sell on Amazon, Coastal loses untold numbers of sales every day, and suffers immeasurable harm to its reputation and standing in the highly competitive marketplace for hot chocolate bombs.  *Id.* ¶¶ 25-29.

**C.    The USPTO Recognizes that "Bomb" and "Hot Chocolate Bomb" are Generic Or Descriptive**

Coastal filed two applications with the USPTO to protect its BOMBOMBS trademark on October 26, 2020, prior to the filing of Defendant's trademark application: one for BOMBOMBS alone (Serial No. 90279475) and one for BOMBOMBS HOT CHOCOLATE BOMBS (Serial No. 90279467).  Lantz Decl. at

Exs. A & B.  In an office action responding to the latter application, the trademark examining attorney required Coastal to disclaim any exclusive rights in "hot chocolate bombs" on the ground that "hot chocolate bomb" is the "common descriptive phrase for a molded chocolate candy confection that houses hot chocolate mix and/or toppings, and is used to make a hot beverage." *Id*. at Ex. C at 6.  As evidence, the office action cited the Eater and the New York Times articles using "hot chocolate bombs" in a generic sense, and inferred that Coastal's goods would be "'hot chocolate bombs' or will be used in their construction." *Id.*; *see also* Lantz Decl. ¶ 14(d)-(e) & Ex. M (the Eater and New York Times articles).  In response to Coastal's BOMBOMBS application, the trademark examining attorney commented that the term "bomb" standing alone was likewise descriptive for hot chocolate bombs:

> Applicant's mark BOMBOMBS has a meaning and commercial impression as both a play on the term "bonbon" for candy . . . as well as suggesting "bombs", a popular descriptive term for a ball of chocolate containing hot cocoa mix and sometimes other candies for making hot cocoa beverages.

Lantz Decl. Ex. C, at 5.

The trademark examining attorney also noted that Coastal's BOMBOMBS HOT CHOCOLATE BOMBS application potentially conflicted with earlier pending applications to register HOT COCOA BOMBS and COCOA BOMBS.  Both of those pending applications have now been rejected by the Trademark Office because they are generic or merely descriptive and, thus, fail to function as trademarks.  Lantz Decl. Exs. D & E.  In an October 27, 2020 office action on HOT COCOA BOMBS, the examining attorney relied on online publications to conclude that "'HOT COCOA BOMBS' is commonly used by those in applicant's particular trade or industry to indicate a common term for hot chocolate goods." *Id.* at Ex. D at 3.  In an office action for the COCOA BOMBS application, the examining attorney concluded that the applied-for mark "appears to be generic." *Id.* at Ex. E at 2.  The office action rejected the applicant's argument that the term "bomb" was suggestive rather than descriptive, and concluded based on internet evidence that "COCOA BOMBS is commonly used in connection with chocolate confections" and "consumers will immediately understand

that the proposed mark informs them that applicant provides hot cocoa bombs to make hot chocolate/cocoa." *Id.* at 3.

Notwithstanding this treatment of similar (and earlier) applications, Defendant's "BOMB" application did not receive a descriptiveness refusal, and the examining attorney also did not identify Coastal's prior-filed application, or either of the COCOA BOMBS applications, as posing a potential likelihood of confusion.

### D.    Frankford's BOMB Application and Enforcement

Despite the ubiquitous use of "hot chocolate bomb" to describe a chocolate ball that melts or dissolves in liquid to make hot chocolate, on November 12, 2020, Defendant applied to register the trademark BOMB.   Lantz Decl. ¶ 7 & Ex. F. Defendant's application listed Defendant's goods as "Hot beverage mix; candy," and claimed a first use in commerce date of October 8, 2019 — after Coastal began using the term "hot chocolate bomb."   Lantz Decl. at Ex. F, at 1.   In order to file its application, Defendant's attorney was required to sign a declaration under oath stating that "[t]o the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."   *Id.* at 4.   Given the generic nature of the "bomb" term, Defendant's counsel's declaration was plainly false.

Despite extensive generic and descriptive use of hot chocolate bomb, both in the public domain and in Defendant's specimen filed with the USPTO, as well as Coastal's earlier application to register BOMBOMBS and BOMBOMBS HOT CHOCOLATE BOMBS, the Trademark Office did not reject Defendant's mark as descriptive or generic, and did not identify any conflicting registrations or applications.   The only objection that the Trademark Office raised was to request that the description of goods be amended to specify that Defendant sold "hot chocolate beverage mix; candy."   *Id.* at Ex. G, at 2.   Defendant's mark registered on August 17, 2021.   *Id.* at Ex. H.

9

Once Defendant knew that its BOMB registration would issue, but before it actually did, Defendant sent Coastal a cease and desist letter on August 12, 2021. *Id.* at Ex. I.  Two weeks after Defendant received its registration, on September 3, 2021, it filed trademark complaints with Amazon.com that sought the removal of Coastal's product listings for all of its BOMBOMBS hot chocolate bombs. Lantz Decl. Ex. J; Shonfeld Decl. ¶¶ 18-19.  Coastal responded to Defendant the same day, demanding that Defendant withdraw its complaints with Amazon and explaining that Defendant could not assert exclusive rights in the terms "bomb" or "hot chocolate bomb" for chocolate balls that dissolve in liquid to make hot chocolate. Lantz Decl. Ex. J.

Coastal later followed up with Defendant by email, attaching some of the extensive evidence that 'bomb' is a descriptive and generic term when used to refer to hot chocolate bombs. Shonfeld Decl. ¶ 21.  In the meantime, Amazon removed all of Coastal's hot chocolate bomb listings, destroying Coastal's primary channel to market and sell its hot chocolate bombs to consumers. *Id.* ¶ 23.  Coastal had tried to address the issue directly with Amazon, but has so far been unsuccessful, necessitating this motion. *Id.* ¶ 24.  And Defendant has refused to withdraw its complaints. *Id.* ¶ 22.

**E.    Consumer Searches on Amazon**

Consumers search for products online in the way they speak about them in real life.  Declaration of Aleks Reljic ("Reljic Decl.") ¶ 4.  While it is impossible to know all the search terms used on Amazon, it is possible to research the volume of use of specific terms over time.  Such searches show that "hot chocolate bombs" is heavily searched compared to similar terms, and that those searches have a seasonality.  Reljic Decl., ¶ 5-16.  Specifically, searches show the following volume of searches for "hot chocolate bombs" reached a high in December 2020 of over 700,000 searches a week before dropping off after the holidays, whereas "cocoa bombs" reached a high of 186,000 searches at the same time, only a third the volume.  Reljic Decl. 7-11.

While it is possible to gin up other terms that consumers could use to search for hot chocolate bombs, those terms have not actually been used by consumers.  Searches

in Helium10, an industry standard tool that uses data from the Amazon platform to show the volume of particular search terms used on Amazon.com by country, indicate that the following terms, while technically possible, have not been searched by consumers at all in the last 30 days:  melting hot chocolate balls, melting cocoa balls, melting chocolate ball, melting marshmallow ball.  *See* Reljic Decl., ¶ 13-16.

## III.   ARGUMENT

### A.   Legal Standard

Coastal is entitled to a temporary restraining order pursuant to Rule 65(b)(1), which states that the "court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if . . . specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and . . . the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  Fed. R. Civ. P. 65(b)(1).

To be entitled to temporary injunctive relief, an applicant must meet one of two variants of the same standard.  Under the traditional standard, the movant must show: (1) that it is likely to succeed on the merits; (2) that it will suffer irreparable harm in absence of a preliminary injunction or temporary restraining order; (3) that the balance of equities tips in favor of the moving party; and (4) that granting injunctive relief is in the public's interest.  *Alliance For The Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Immigrant Assistant Project of Los Angeles County Fed'n of Labor v. INS*, 306 F.3d 842, 873 (9th Cir. 2002).

Under the "sliding scale" variant, "if a plaintiff can only show there are 'serious questions going to the merits' – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,'" and plaintiff can show there is a likelihood of irreparable injury and that the injunction is in the public interest.  *Alliance For The*

*Wild Rockies*, 865 F.3d at 1217 (emphasis in original); *see also Beyond Blond Prods., LLC v. Heldman*, 479 F. Supp. 3d 874, 880 (C.D. Cal. 2020). "At an irreducible minimum, the moving party must demonstrate a fair chance of success on the merits or questions serious enough to require litigation." *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009). The two alternatives represent extremes of a continuum rather than separate tests. *Immigrant Assistant Project of Los Angeles County*, 306 F.3d at 873.

**B.   Coastal is Entitled to a Temporary Restraining Order**

The Court should grant this motion and require Defendant to withdraw its trademark complaint with Amazon against Coastal's hot chocolate bomb listings, and also enjoin Defendant from making more such complaints pending a trial on the merits. Courts have broad authority to tailor injunctive relief, including ordering retraction of IP complaints via preliminary injunctions. See, e.g., *Beyond Blond Prods., LLC v. Heldman*, 479 F. Supp. 3d 874, 880 (C.D. Cal. 2020)(granting preliminary injunction requiring retraction of Amazon complaints and barring defendant from issuing new complaints to Amazon); *Design Furnishing, Inc. v. Zen Path, LLC*, No. 10-2765, 2010 U.S. Dist. LEXIS 135819, at *31 (E.D. Cal. Dec. 23, 2019)(granting preliminary injunction barring defendant from making additional complaints to eBay); *Amaraetto Ranch Breedables, LLC v. Ozimals, Inc.*, 790 F. Supp. 2d 1024, 1026 (N.D. Cal. 2011).

Specifically, Coastal is likely to succeed on the merits on its claim that Defendant's BOMB registration and the terms "bomb" and "hot chocolate bomb" are generic or at least descriptive, and that Defendant has no right to prevent anyone, including Coastal, from using those terms to describe hot chocolate mixers. Coastal has been irreparably harmed by the loss of customers, loss of goodwill, damage to its reputation, downgrading in the Amazon algorithm for each day the product is off the Amazon platform, and possible termination from the Amazon platform if further complaints are made by Defendant. The balance of hardships favor Coastal – returning to the pre-September 3, 2021 status quo will alleviate the irreparable harm to Coastal. And the public interest is served by allowing competition in the marketplace.

**1.    Coastal is Likely to Succeed on the Merits of its Invalidity Claim**

Coastal is likely to succeed in showing, either at summary judgment or trial, that "bomb" and "hot chocolate bomb," when used in connection with chocolate balls that dissolve in milk or water to make hot chocolate, are either generic or descriptive terms that lack secondary meaning, and cannot function as trademarks.

**a.    Defendant's BOMB Term is Generic and Unenforceable**

"A 'generic' term is one that refers, or has come to be understood as referring, to the genus of which the particular product or service is a species." *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999); *Surgicenters of Am., Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979).  Put another way, a generic term is "the name of the product or service itself." *Filipino Yellow Pages*, 198 F.3d at 1147; *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1188 (C.D. Cal. 2007) ("Generic marks receive no trademark protection, even with a showing of secondary meaning, because they merely identify what a product is.").  As such, a generic term can never serve as a trademark. *Id.*; *Krav Maga Ass'n of Am., Inc. v. Yanilov*, 464 F. Supp. 2d 981, 986 (C.D. Cal. 2006).  Where a mark is registered, the party challenging the mark bears the burden of showing genericness. *Filipino Yellow Pages*, 198 F.3d at 1146.

The Ninth Circuit uses the "primary significance" test, which asks whether the "primary significance of the trademark is to describe the *type of product* rather than the *producer*." *Filipino Yellow Pages*, 198 F.3d at 1147.  Thus, the court first "identif[ies] the category of goods or services to which the mark is meant to apply," and then "analyz[es] whether the relevant consuming public's primary perception of the mark is as a source of a product or as a type, category, or kind of product." *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 148 (N.D. Cal. 2020).  In making that assessment, the court can rely on documentary evidence of how consumers use a mark, such as in social media posts; evidence of media and blog usages; evidence of use by competitors; and, where available, dictionaries and consumer surveys. *Id.* at

149; *see also Surgicenters of Am.*, 601 F.2d at 1017 (relying on letters and comments from consumers and competitors); *Krav Maga Ass'n of Am.*, 464 F. Supp. 2d at 987 ("magazine articles, textbooks, and advertisements" showing generic use sufficient to demonstrate genericness at summary judgment).  Relevant evidence also includes how the Trademark Office has addressed other applications for the allegedly generic term. *Threshold Enters.*, 445 F. Supp. 3d at 152-53.

### b. Third Party Uses Show Genericness of Defendant's Claimed Mark

Here, the category of product is chocolate balls that, when melted or dissolved in milk or water, make hot chocolate.  The evidence is overwhelming that "hot chocolate bomb" and its component "bomb" are generic when used to refer to that category of goods.  Specifically, hundreds or thousands of articles, blog posts, recipes, videos, and social media posts refer to "hot chocolate bombs" in a generic sense.

**Online and Print Press.**  Courts rely heavily on how consumers and the media refer to products in assessing genericness.  Thus, in *Surgicenters of America*, the Ninth Circuit found it particularly persuasive that the party challenging the mark had presented numerous letters from consumers and competitors, as well as evidence of the use of the term "surgicenter" in magazines and medical publications.  *Surgicenters of Am.*, 601 F.2d at 1017.  Indeed, the Ninth Circuit in that case concluded that "surgicenters" was generic on the basis of this documentary evidence alone.  *Id.*; *see also Filipino Yellow Pages*, 198 F.3d at 1151 (referring to *Surgicenters* reliance on 45 documentary exhibits).  And in *Classic Foods International*, the court relied on numerous media articles to conclude that the terms "kettle" and "kettle chips" referred to a "general type of potato chip or a segment in the potato chip industry, rather than to [Defendant's] product specifically."  468 F. Supp. 2d at 1190-91.

The evidence presented with this motion includes numerous articles—all easily accessible online —referring to "hot chocolate bombs" or "hot cocoa bombs" in the generic sense.  Shonfeld Decl. ¶¶ 7-8, 12-17; Lantz Decl. ¶¶ 14-15.  The New York

Times, to take just one, referred to hot chocolate bombs as a "tasty metaphor for a pent-up year" (meaning 2020), and used the term generically (alongside "cocoa bomb") to refer to hot chocolate bombs made by several different sellers.  Lantz Decl. ¶ 14(e) & Ex. M.  An article on the Pioneer Woman blog at the end of 2020 likewise used the term generically, titling its article "These are the 12 Coolest Hot Chocolate Bombs You Can Buy."  *Id.* ¶ 14(a) & Ex. M.  The list ranked Coastal's hot chocolate bombs as number 1, Defendant's product at number 12, and other competitive hot chocolate bombs in between.  Even a February 2021 Modern Retail article devoted entirely to Coastal's BOMBOMBS product uses the term generically, referring to the "hot cocoa bomb trend."  Shonfeld Decl. ¶¶ 12-13 & Ex. D.

**Recipes.**  Courts assessing genericness have also assessed public perception of a term's primary significance of by looking to whether there are recipes teaching consumers how to make their own.  *Threshold Enters.*, 445 F. Supp. 3d at 152.  This reliance makes sense.  If recipes are instructing people on how to make their own "hot chocolate bombs," then that is strong evidence that the public views "hot chocolate bombs" as a product category, not a specific brand.  The evidence here too is overwhelming.  Dozens upon dozens of recipes teach home cooks to make their own hot chocolate bombs or hot cocoa bombs.  Lantz Decl. ¶ 15 & Ex. N.  None of these recipes use "hot chocolate bomb" as a generic product reference

**Competitor Usage.**  Competitor usage is especially probative of genericness; the rationale for protecting generic terms is that giving one person exclusive rights to a generic term would "grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are."  *Surgicenters of Am.*, 601 F.2d at 1017.  Thus, if numerous competitors must use the term to identify the same type of product, the term is likely to be generic.  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 840 (9th Cir. 2001) (evidence that thirteen competitors used term "fire safe" generically); *Closed Loop Marketing, Inc. v. Closed Loop Marketing, LLC*, 589 F. Supp. 2d 1211, 1219 (E.D. Cal. 2008) ("closed loop marketing" generic where

evidence included "at least six non-party companies" tha referred to themselves as providing closed loop marketing services); *Classic Foods Int'l*, 468 F. Supp. 2d at 1190 (competitor use in industry is "strong evidence of how the public perceives the term").

The evidence here is overwhelming that other sellers of hot chocolate bombs use the term to refer to their product. First, Coastal has been using the term "hot chocolate bomb" since early 2019—before Defendant claims in its BOMB application to have begun use. That alone is probative that competitors use "hot chocolate bomb" to refer to a product category, and that Defendant as a late-comer has wrongfully tried to appropriate that category to itself. But there's far more. Etsy, a popular online marketplace, returns more than 5,500 product listings in response to a search for "hot chocolate bombs." Shonfeld Decl. ¶¶ 14-16. Even a quick perusal of those results highlights that they are not referring to products sold by Defendant, but are using the term "hot chocolate bombs" in the generic sense to refer to each Etsy seller's *own* product. Google's "Shopping" search engine similarly returns numerous search results for product listings that use the "hot chocolate bombs" in the generic sense. *Id.* ¶ 16 & Ex. E. This evidence indicates both that competitors view the term hot chocolate bomb as generic, and also highlights the irreparable harm that Coastal and other competitors would suffer from Defendant's improper assertion of trademark rights. If Defendant is correct that it is the only one that can refer to "hot chocolate bombs" or "bombs" for making hot chocolate, then *thousands* of competitors would be deprived of the use of a term that accurately describes their product and that consumers associate with a product category, and not with any particular source of hot chocolate bombs. *See* Reljic Decl. That result is exactly the de facto "monopoly" that the genericism doctrine tries to prevent. *Surgicenters of Am.*, 601 F.2d at 1017.

In fact, even Defendant used "hot chocolate bomb" generically until it decided to use its improper trademark assertion to suppress competition. Defendant's own website referred to its product as a "hot chocolate bomb" in its product description. Lantz Decl. Ex. K. Defendant's Walmart listing for its product *still* uses "hot chocolate

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

bomb" generically, stating that the product is a "Foil wrapped Hot Chocolate bomb" and that "Each Hot Chocolate Bomb is 1.6 oz." *Id.* at Ex. L.

**Social Media.** Use of "hot chocolate bombs" on social media further confirms that consumers understand the term to refer to a product category, and not to a product source. TikTok videos using the hashtag #hotchocolatebombs have been viewed more than 300 million times. Shonfeld Decl. ¶ 7. The use of the hashtag is not to refer to Defendant's product, but to refer generically to hot chocolate bombs, including ones that the video posters have made themselves. A search of Twitter for "hot chocolate bombs likewise shows countless references to "hot chocolate bombs," not as a brand but as a product. *Id.* ¶ 8. Finally, a search of Instagram for the hashtag #hotchocolatebombs returns more than 230,000 posts using the term to refer generically to hot chocolate bombs. *Id.* ¶ 8 & Ex. C. This is all powerful evidence that the primary significance of the term "hot chocolate bombs" is to denote a product category, and not a brand name. *Threshold Enters.*, 445 F. Supp. 3d at 152 ("dozens" of Instagram posts strong evidence that "wellness shot" is generic). In the language of the Ninth Circuit's test, these social media posts all use "hot chocolate bomb" to answer the question "what are you" in reference to the product, rather than "who are you"? *Krav Maga Assn. of Am.*, 464 F. Supp. 2d at 987.

### c.   Trademark Office Recognizes Genericness of Defendant's Claimed Mark

The Trademark Office's treatment of other applications using the term "HOT CHOCOLATE BOMBS" and "COCOA BOMBS" is strong evidence of the genericness of Defendant's claimed BOMB mark.

"The USPTO's treatment of a term in other applications is material to a Court's analysis of genericness." *Threshold Enters.*, 445 F. Supp. 3d at 153. Here, although Defendant's application did not receive a rejection on the ground that the mark was "merely descriptive," the Trademark Office has repeatedly rejected similar applications on that ground, or has required a disclaimer of exclusive rights in the descriptive term "hot chocolate bomb." In examining Coastal's application to register BOMBOMBS

HOT CHOCOLATE BOMBS, the Trademark Office issued a disclaimer requirement asking Coastal to disclaim any exclusive rights in "HOT CHOCOLATE BOMBS." Lantz Decl. Ex. C, at 6. The rationale for the disclaimer was precisely what Coastal argues here: "'HOT CHOCOLATE BOMBS' is the common descriptive phrase for a molded chocolate candy confection that houses hot chocolate mix and/or toppings."[1] *Id.* In the same office action, the examining attorney highlighted that the term "bombs" standing alone is a "popular descriptive term for a ball of chocolate containing hot cocoa mix and sometimes other candies for making hot cocoa beverages." *Id.* at 5.

The Trademark Office also found two highly similar applications to Defendant's—for COCOA BOMBS and HOT COCOA BOMBS for use in connection with chocolate confections and hot chocolate mixes—to be merely descriptive and therefore failing to function as a trademark. In examining HOT COCOA BOMBS, the Trademark Office concluded that the term was "commonly used by those in applicant's particular trade or industry to indicate a common term for hot chocolate goods." Lantz Decl. Ex. D, at 3. With respect to "COCOA BOMBS," the Trademark Office found similarly, and specifically rejected the applicant's argument that "BOMB" was suggestive rather than descriptive. Rather, "the Internet evidence demonstrates that COCOA BOMBS is commonly used in connection with chocolate confections." *Id.* at Ex. E, at 3. Accordingly, the Trademark Office concluded that "COCOA BOMBS merely describes a feature of applicant's goods by informing consumers that applicant provides hot cocoa bombs to make hot chocolate/cocoa." *Id.*

Together, the evidence presented with this motion is overwhelming: "hot chocolate bomb" is the name of a category of product—balls of chocolate that can be dissolved in milk or water to make hot chocolate. Likewise, in that context, "bomb" is

---

[1] The phrase "common descriptive" is another way of saying that a mark is generic. *See Filipino Yellow Pages*, 198 F.3d at 1147 ("Courts sometimes refer to generic terms as 'common descriptive' names, the language used in the Lanham Act for terms incapable of becoming trademarks.").

simply a generic or descriptive term that identifies that the product dissolves in liquid. The Court should accordingly find that Coastal has shown a likelihood of success on its claims that the terms BOMB and HOT CHOCOLATE BOMB are generic or merely descriptive, and therefore not protectable as a trademark.[2]

Defendant will predictably argue that their application was allowed to register by the USPTO, and the court must defer to that determination. The Ninth Circuit, however, has determined that the USPTO's decision is entitled to little weight in court proceedings. *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F2d 794 (9th Cir. 1970). The court reasoned "[a]ny such determination made by the Patent Office . . . must be regarded as inconclusive since made at its lowest administrative level . . . The determination by the Patent Office is rendered less persuasive still by the fact that the Patent Office did not have before it the great mass of evidence which the parties have since presented to both the District Court and this court in support of their claims." *Id.* at 802; *see also Tranik Enterprises, Inc. v. Fulda*, No. 2:16-CV-02931-SVW-JC, 2017 WL 11150925, at *4 (C.D. Cal. Mar. 7, 2017)(citing to *Carter-Wallace* for the proposition that the finding by the USPTO was not binding on the court and "need not be given much weight depending on the circumstances of the decision.")

## 2. Coastal Has Shown That It Will Suffer Irreparable Harm

Coastal has already suffered, and continues to suffer, irreparable harm without the injunctive relief it seeks. Each day that Coastal's listings are deactivated, it is losing potential new customers for its BOMBOMBS hot chocolate bombs and suffers damage to its reputation. Shonfeld Decl. ¶ 25; Reljic Decl. ¶¶ 18-23. It is also losing standing

---

[2] A descriptive mark is one that "forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Surgicenters of Am.*, 601 F.2d at 1019. A descriptive mark is not protectable unless alleged owner of the mark shows that it has acquired "secondary meaning," meaning that consumers have come to associate the term exclusively with the mark owner. *Filipino Yellow Pages*, 198 F.3d at 1151. While the evidence strongly indicates that "hot chocolate bomb" and "bomb" are generic, if the Court were to find that they are descriptive terms, there is no evidence of secondary meaning and thus they would be unprotectible in any event.

in the Amazon algorithm, which recommends products more highly the longer that they have been listed on Amazon. Shonfeld Decl. ¶ 28; Reljic Decl. ¶ 17. That is especially harmful now, when the holiday shopping season is starting to pick up. Loss of potential new customers, and the accompanying goodwill, is a classic irreparable harm in trademark cases, and is precisely what Coastal is facing. *Stuhlbarg Int'l*, 240 F.3d at 841; *see also* Shonfeld Decl. ¶¶ 25-28. Just as compelling, the inability of both established and new hot chocolate bomb customers to find Coastal's listings will inevitably cause harm to Coastal's goodwill and reputation in the highly competitive marketplace for hot chocolate bombs. *See Beyond Blond Prods.*, 479 F. Supp. 3d at 888 (removal of Amazon product listings caused irreparable harm to goodwill and reputation, and in the form of threatened loss of prospective customers). In particular, the loss of product reviews for products sold before September 3, 2021 is a harm that cannot be overstated. Reljic Decl. ¶ 18. A year of Coastal's goodwill is gone.

As the evidence submitted with this motion shows, there are many sellers of hot chocolate bombs, and therefore any slip in standing among consumers by Coastal could be devastating. Coastal's products are some of the most well-known in this category, as evidenced by Coastal's recognition in the media and on blogs. But Defendant's conduct in sending a takedown notice to Amazon threatens that goodwill. For example, the blog post on The Pioneer Woman ranking Coastal's BOMBOMBS hot chocolate bombs as number 1 on its list of the "coolest hot chocolate bombs you can buy" included a link to one of Coastal's Amazon listings. Consumers now see an Amazon page that tells consumers "SORRY we couldn't find that page:" Shonfeld Decl. ¶ 31.



Courts have recognized that these "dead links" or dead-end websites cause harm by giving consumers the impression that the brand or product is "defunct." *Rotoworks Int'l Ltd. v. Grassworks USA, LLC*, 2007 WL 2582202, at *3 (W.D. Ark. Sept. 4, 2007) (error message on plaintiff's website would "give[] the appearance to the consuming public" that the brand was defunct and was "tantamount to disparagement"). Thus, a dead Amazon link is both a potential lost sale and harms Coastal's reputation by suggesting to consumers that Coastal's brand is defunct, while others continue to sell. Shonfeld Decl. ¶ 31. This harm is especially acute in the world of viral products, where popularity peaks and then wanes and it is important for sellers to be in a position to take advantage of the wave. *Id.* ¶¶ 3, 11.

Coastal's reputation is also harmed by the loss of over 1400 four-star or higher reviews for the products previously listed on Amazon. Prior to the removal of the listings on September 3, 2021, Coastal's BOMBOMBS products had at least 1482 four-star or higher reviews on Amazon. Customer reviews are extremely important to a product's reputation and a seller's success on Amazon. Reljic Decl. ¶ 18. When the BOMBOMBS product listings were taken off Amazon, all of the reviews were also taken down. *Id.* at ¶ 19. If an Amazon product listing is taken down and then restored, the customer reviews are restored with the listing. Id. at ¶ 20. However, if a new product listing is put up, and there is no related old product listing, then no reviews appear for the new listing, even if the product is related to a product previously sold on Amazon. *Id.* at ¶ 21. This means that the seller is essentially starting over, as though they had never sold the product on Amazon before. *Id.* at ¶ 22. A lack of product reviews for previously sold products hurts sellers, because of the importance that consumers put on positive customer reviews. Id. at ¶ 23. This is another element of irreparable harm to Coastal's reputation and ability to obtain new customers.

Had Defendant filed an infringement suit and sought a preliminary injunction, it would have been unable to meet the irreparable harm requirement to obtain an injunction, but it obtained a *de facto* injunction from Amazon by submitting a form.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

1  Defendant's only harm, if they can prove infringement – which they cannot – would be

2  monetary damages, which do not qualify as irreparable harm.

3  Conversely, with Coastal's Amazon listings deactivated, Coastal is shut off from

4  prospective customers, and is suffering the intangible and irreparable injuries of

5  potential customers thinking that Coastal's product has been discontinued, its lost

6  advertising efforts, loss of rankings and reviews and diminution of its status in the

7  Amazon algorithm, and it is suffering the accompanying harm to its reputation and the

8  goodwill that it has fought so hard to establish. *See Beyond Blond Prods.*, 479 F. Supp.

9  3d at 888; *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 838 (9th Cir.

10  2001)(affirming injunctive relief to restore status quo to allow "the immediate release

11  of its goods to avoid irreparable harm stemming from lost contracts and customers, and

12  harm to its business reputation and goodwill.")   Coastal has therefore established that

13  it will suffer imminent irreparable harm without an injunction.

14     **3.    The Balance of Hardships Favors Coastal and Issuing an Injunction**

15  The balance of hardships in this case tip strongly in favor of Coastal.  First, as

16  set forth above, denying an injunction would result in Coastal's listings remaining off

17  of Amazon, which is causing Coastal irreparable harm every day.

18  In contrast, the only harm that Defendant will suffer from an injunction is having

19  to revert to the status quo before September 3, 2021, in which Coastal and Defendant

20  both had product listings for hot chocolate bombs on Amazon.  As highlighted above,

21  that is no "harm" at all—countless other competitors already describe their products as

22  "hot chocolate bombs" and compete against Defendant.  Moreover, in the unlikely

23  event that Defendant were to prevail in an infringement case, such harm is compensable

24  by money damages, and therefore should not be factored into the balance of harms.

25  Defendant is likely to say that Coastal has other terms that it could use to describe its

26  product.  However, the terms the public knows and uses to search for these products

27  are the most relevant terms, even if others could be coined.  If Defendant is able to

28  monopolize the term used to refer to these products in thousands of online sources,

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

Coastal (and the public) will be irreparably harmed.  Shonfeld Decl. ¶ 32.

Last year, starting in approximately mid-October 2020, searches on Amazon for the term "hot chocolate bombs" began ramping up, reaching a search volume of over 700,000 searches per week on December 18, 2020.  Reljic Decl. ¶ 7.  Right now the search volume for that term is about 15,500 searches per week.  *Id* at ¶ 6.   The next highest relevant term, "cocoa bombs," is only receiving about 2,400 searches per day, less than a fifth of the searches for "hot chocolate bombs."  *Id.* at ¶ 10.  Other terms, such as "melting hot chocolate balls," "melting cocoa balls," "melting chcolate ball," and "melting marchmallow ball" do not appear in the search results at all – no one has searched for them.  *Id.*at ¶ 13-16.  This indicates that consumers do not think of products in these terms.  This highlights the hardship that Coastal will face if it cannot use the



generic term "hot chocolate bomb" to refer to its product, and also underscores that consumers use the term "hot chocolate bomb" and "bomb" to identify a ***genus*** of product, and not a particular brand.  That is why consumers use "hot chocolate bombs" considerably more than any other term to find products of this sort on Amazon.

### 4.    The Public Interest Favors Preliminary Relief

The public interest strongly favors Coastal's injunction request.  Defendant's improper trademark complaints have resulted in Coastal's products being removed from Amazon, thereby denying consumers the ability to search for, purchase, and enjoy them.  This not merely harms Coastal, but it also harms the public, which is deprived of the benefit of free and fair competition among sellers of hot chocolate bombs.  The public has a strong interest in the "preservation of competition." *United States v. Tribune Publishing Co.*, 2016 WL 2989488, at \*5 (C.D. Cal. Mar. 18, 2016).  Moreover, there is a public interest in litigating this dispute in court, where the burden to show infringement is properly placed on the party alleging infringement.  In contrast, Amazon's takedown policies essentially allows Defendant to harass Coastal by having its listings taken down—without any showing of merit by Defendant — during the time it takes to litigate this case.  *Beyond Blond Prods.*, 479 F. Supp. 3d at 889.

### C.    No Bond Should be Required

Federal Rule of Civil Procedure 65(c), addressing the court's authority to require the movant to post security before an injunction takes effect, vests a court with "discretion as to the amount of security required, if any." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).  The district court may, therefore, grant an injunction without requiring security at all, particularly if "there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.*

That is precisely the case here, and favors an injunction on no bond.  Coastal's requested injunction requires only that Defendant consent to the restoration of free competition between Coastal and Defendant on a single sales platform—Amazon.  Until September 3, 2021, that was the status quo between Coastal and Defendant— competition for the sale of hot chocolate bombs.  Defendant will suffer no harm from returning to that status quo while this case is pending other than the "harm" that naturally arises from having to compete for sales, which is a "harm" that Defendant has no legitimate interest in suppressing.  Indeed, the court in *Beyond Blond Productions*

issued an injunction nearly identical to the one that Coastal requests here, and required no bond. *Beyond Blond Prods.*, 479 F. Supp. 3d at 890.

## IV.    GOOD CAUSE EXISTS FOR WAIVING EX PARTE NOTICE

Pursuant to Fed. R. Civ. P. 65 (b), the Court may issue this temporary restraining order without written or oral notice to the adverse parties.  Counsel will serve this motion on Defendant's trademark counsel by email, but the Court should proceed without further notice.  As set forth in the declaration of Mr. Shonfeld, Coastal is suffering irreparable harm every day that its Amazon listings remain down; this is a situation where every minute counts, and thus the Court should not wait for a response from Defendant to act on this application for a temporary restraining order.

Moreover, Defendant has had notice of Coastal's position for three weeks, since Coastal's September 3, 2021 letter outlining its invalidity position on Defendant's trademark for BOMB and the claim to rights in the term "hot chocolate bomb."  Coastal demanded then that Defendant withdraw its complaints with Amazon so that Coastal's product listings could be restored.  Defendant has refused.  Defendant is therefore not entitled to further notice before the Court exercises its equitable powers to order Defendant to withdraw its trademark complaints immediately.

## V.    CONCLUSION

Coastal respectfully requests that the Court issue a temporary restraining order and set this matter for an hearing on Coastal's order to show cause why a preliminary injunction should not issue.


Dated: September 23, 2021          **DUANE MORRIS LLP**


                                   By: /Jennifer M. Lantz/
                                   Jennifer M. Lantz

                                   Attorney for Plaintiff
                                   Coastal Cocktails, Inc.